UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10240-RGS

UNITED STATES OF AMERICA

v.

SCOTT TOWNE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
AND MOTION TO DISMISS

April 15, 2010

STEARNS, D.J.

In these two motions, defendant Scott Towne seeks to suppress evidence seized from his home at 42 Belmont Street in East Bridgewater, Massachusetts. The search was conducted pursuant to a warrant issued by a Magistrate of the Brockton District Court. Towne contests the affiant's showing of probable cause, and contends that, in any event, the searching officers exceeded their authority under the warrant. Towne also seeks a dismissal of the underlying indictment on grounds of outrageous government misconduct. On January 15, 2010, the court heard evidence on the motion to suppress. Counsel also presented argument on the motion to dismiss.

BACKGROUND

Towne and fourteen members of the Taunton chapter of the Outlaws Motorcycle Club (Outlaws) were indicted for conspiring to distribute cocaine and marihuana. The

indictment was the culmination of a two-year joint federal and state investigation.[1] In tandem with the indictment, search warrants were obtained by members of the investigating task force. Among the searches authorized was that of Towne's East Bridgewater residence. The affiant who applied for and obtained the warrant was Sgt. Thomas Higginbotham of the Massachusetts State Police (MSP).

## THE MOTION TO SUPPRESS

### Findings of Fact

The following facts are taken from the testimony presented at the January 15, 2010 hearing, and more particularly, the affidavit submitted in support of the search warrant. Higginbotham (who is now retired) served thirty-one years as an MSP officer. Over the course of his career, he participated in over 100 drug investigations and was responsible for some 50 to 100 search warrant applications.[2] He is an expert on the Outlaws and on motorcycle theft.[3]

The essential facts presented to the Magistrate in the affidavit are as follows. The investigation began in 2005 with the introduction of an undercover federal agent (referenced in the affidavit as UC-1) to members of the Taunton chapter of the Outlaws

---

[1] The Outlaws is an international motorcycle club founded in Illinois in 1935. It has over one hundred chapters in the United States. The Outlaws makes little effort to conceal its double life as a criminal syndicate. Its main rival in the United States is the Hells Angels Motorcycle Club.

[2] Higginbotham served as a member of the MSP Drug Unit from 1981 until his retirement.

[3] Higginbotham is a member of the International Outlaws Motorcycle Gang Investigators Association and instructs law enforcement officers on the subjects of motorcycle gangs and vehicle theft.

and their associates. Among those befriended by UC-1 was Towne who, although not a member of the Outlaws, was friendly with many of its members. Towne confided in UC-1 that the Hells Angels respected him (Towne) because he had emerged victorious in past fights with Hells Angels and had forced his victims to part with their "colors."[4] On August 13-14, 2005, Towne invited UC-1 to an Outlaws party in Brockton and then back to his home. There he showed UC-1 a set of Hells Angels colors that he had taken in a "beat down" of a member of Hells Angels. On December 15, 2005, Towne invited UC-1 to his home for a showing of a second set of captured Hells Angels colors.

On July 21, 2006, UC-1 was present when Towne agreed to purchase a 2004 Vulcan motorcycle from Joseph Noe, the President of the Taunton chapter of the Outlaws. The true owner of the Vulcan intended to report it as stolen for insurance fraud purposes.[5] On July 22, 2006, UC-1 was present when Towne paid Noe $7,000 for the Vulcan and agreed to alter its Vehicle Identification Number (VIN). The Vulcan was reported stolen to the Avon Police later that day.

In February of 2007, UC-1 hired Towne to repair his 1993 Harley Davidson "Fat Boy" motorcycle. While visiting at Towne's home, UC-1 saw the Vulcan, and asked Towne whether he had changed the VIN. Towne told UC-1 that he had not altered the VIN, but

---

[4]The term "colors" refers to the distinctive jacket patches worn by members of a motorcycle gang, such as the Hells Angels or Outlaws. The Outlaws "colors" consist of a skull and crossed pistons, while the Hells Angels display a winged death's head. According to Higginbotham, a motorcycle gang's colors are "sacred," and the gangs rob colors from one another to display as "trophies."

[5]Over the course of the investigation, UC-1 bought thirteen vehicles (cars, trucks, and motorcycles) from members and associates of the Taunton Outlaws chapter as part of a purported insurance fraud scheme.

planned to remove the VIN plate and weld on a new plate with a different VIN.

On July 27, 2007, UC-1 told Higginbotham that he had spoken with Towne by telephone. Towne told UC-1 that he had sent the fenders and fuel tank of the Vulcan out to be repainted. UC-1 also advised Higginbotham that Towne had replaced the fenders and tank on UC-1's Fat Boy.

On July 31, 2007, after Towne's arrest, Higginbotham and five other officers executed the warrant at Towne's home. The warrant authorized the search for and seizure of the following.

> Proof of (residency/ownership). Two (2) sets of Stolen Hells Angels Motorcycle Club "COLORS" or any part thereof, Black gas tank, front and rear Harley Davidson fenders which is the property of the Federal Bureau of Investigation, A Stolen 2004 Vulcan motorcycle, Massachusetts Registration MZ4410, VIN: 1V9SSV6A54H086039, die stamps and tools used to alter or deface vehicle identification numbers, notes, records, receipts, and all other documents pertaining to the purchase of a stolen 2004 Vulcan motorcycle.

After the home was secured, officers under Higginbotham's supervision began the search at 6:10 a.m.[6] As items were located by search team members, they were brought to Higginbotham who made the decision whether or not to seize them. The team first found gang-related clothing and insignias in the master bedroom. In a bedroom entertainment center, the team found a prescription pill bottle. In a dresser next to the bed, they found ten rounds of .38 caliber ammunition. Ten minutes later, $39,000 wrapped in $1,000 bundles was discovered in a canvas bag hidden behind the dresser. Almost simultaneously, in the kitchen, officers (including Higginbotham) came across evidence

---

[6]Vicki Mager, Towne's girlfriend and the mother of his child, was present during the search. She did not testify at the hearing.

of drug use (a scale, a spoon with residue, and plastic sandwich bags, among other items). In Mager's bedroom, the officers found a portable cash drawer containing $4,400. An unlocked safe located near the first floor entryway was found to contain syringes and prescription steroid drugs. Officers discovered another bag on top of the refrigerator in the kitchen containing $2,000 and steroid drugs. Next, four plastic garbage bags containing marihuana were found in the attic of the detached garage. In the garage, the officers also found the Fat Boy and two sets of motorcycle fuel tanks and fenders. At various points during the search, papers showing Towne's ownership of the home and the Vulcan motorcycle were seized. The search ended at 9:45 a.m.

Rulings of Law

A search warrant may issue on a showing of probable cause — something more than a suspicion, but something significantly less than proof beyond a reasonable doubt. See Safford Unified Sch. Dist. No. 1 v. Redding, 129 S.Ct. 2633, 2639 (2009) (probable cause is a fluid concept taking its substantive content from the particular circumstances – "the best that can be said generally about the required knowledge component of probable cause . . . is that it raise a 'fair probability,' . . . or a 'substantial chance,' . . . of discovering evidence of criminal activity."). Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). The standards defining probable cause are "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable

caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion) (internal citation omitted). "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity." United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986).[7]

Towne challenges the showing of probable cause on three grounds: (1) that the affidavit failed to establish any probability that Towne had committed a crime "with the *possible* exception of aiding and abetting the filing of a fraudulent insurance claim regarding the 2004 Vulcan motorcycle"[8]; (2) the failure to establish a nexus between the items designated to be seized and his home; and (3) to the extent that such a connection was made, the supporting information contained in the affidavit was "stale."

      a.      Failure to Allege a Crime

This argument is difficult to parse, as Towne concedes that the affidavit describes an insurance fraud scheme in which he was a participant. See Mass. Gen. Laws ch. 266, § 111B. See also Mass. Gen. Laws ch. 268, § 39 (false reports of vehicle theft). Moreover, Towne, by his own account, had taken the two sets of Hells Angels colors by

---

[7] Towne does not challenge the sufficiency of the affidavit based on the fact that it relies heavily on an informant's (UC-1) reports. See Gates, 462 U.S. at 227-228. This is understandable, as UC-1's credibility as an officer informant is presumed. United States v. Ventresca, 380 U.S. 102, 108 (1965). Moreover, his basis of knowledge – personal observation – is unchallengeable. Cf. Spinelli v. United States, 393 U.S. 410, 425 (1969) (White, J., concurring).

[8] Def.'s Mot. to Suppress Mem. at 7.

force and intimidation, an admission to the crime of unarmed robbery. Mass. Gen. Laws ch. 265, § 19. Finally, Towne's stated intention to alter the VIN of the Vulcan motorcycle is itself a crime under Massachusetts law punishable by a sentence to state prison. See Mass. Gen. Laws ch. 266, § 139.

        b.    Connection to the Premises

There must be reasonable cause to believe that the place to be searched is connected to the underlying criminal activity and is thus a likely repository of evidence. "[T]he nexus between the items to be seized and the place to be searched need not be based on direct observation. The nexus may be found in 'the type of crime, the nature of the missing items, the extent of the suspects' opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property [or other contraband].'" Commonwealth v. Cinelli, 389 Mass. 197, 213 (1983). "Items that are durable, of continuing utility, and not inherently incriminating, are of the kind that are reasonably likely to be found in a defendant's home after a crime." Commonwealth v. Wilson, 427 Mass. 336, 343 (1998). The nexus here is provided by UC-1's observation of the Vulcan motorcycle and the gang colors on the premises of 42 Belmont Street.

        c.    Staleness

Conceding the plausibility of a connection between these items and his home, Towne nonetheless argues that the information was too dated to provide probable cause to believe that the Vulcan motorcycle and the gang colors would be found on the premises at 42 Belmont Street. Police are not required to seek a warrant the moment they have information sufficient to establish probable cause, but stale information cannot be

considered in the probable cause analysis. Sgro v. United States, 287 U.S. 206, 210-211 (1932). Whether or not information is stale depends on the nature of the property to be seized, the nature of the alleged crime, and the nature of the premises to be searched. Andresen v. State, 331 A.2d 78, 105 (Md. Ct. Spec. App. 1975), aff'd, Andresen v. Maryland, 427 U.S. 463 (1976). "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock." Id., 331 A.2d at 106. Burglar's tools, for example, might reasonably remain in the hands of a professional thief for ten months. Commonwealth v. Scanlan, 9 Mass. App. Ct. 173, 180-181 (1980). Pedophiles typically hide child pornography in the secrecy of their homes and rarely discard the images, hence a pornography collection might reasonably remain in the possession of a pedophile for an indefinite period of time. See United States v. Lacy, 119 F.3d 742, 745 (9th Cir. 1997) (ten months); People v. Russo, 487 N.W.2d 698, 707-711 (Mich. 1992) (six and one-half years); Commonwealth v. Kenney, 449 Mass. 840, 846 (2007) ("Perhaps a lifetime."). Collectors of illegal firearms also carefully preserve their weapons. See United States v. Batchelder, 824 F.2d 563, 564 (7th Cir. 1987) (illegal silencers properly seized on nine-month-old information). See also State v. Bova, 690 A.2d 1370, 1384 (Conn. 1997) (items that are not facially incriminating are more likely to remain undisturbed on a premises than are items that are obviously inculpatory).

The argument that the information regarding the Vulcan was stale has no traction given the July 27, 2007 conversation between UC-1 and Towne in which Towne stated that he had sent the Vulcan's fenders and gas tank out to be repainted. The statement invited

a compelling inference that the Vulcan (or most of it) was still at the premises.[9] UC-1's information regarding the Hells Angels colors was more dated, but given Towne's bragging over his prowess at wresting colors from Hells Angels, it is no more likely that he would have disposed of these spoils of combat than a pedophile his library of child pornography or a weapons collector his illegal arsenal.

Execution of the Warrant

The second aspect of Towne's challenge to the warrant goes to its manner of execution. "Even if the warrant was supported by probable cause, the search exceeded the bounds of the warrant and was not conducted in good faith, which essentially caused it to become an instrument for conducting a general search." Def.'s Mot. to Supp. Mem. at 11. Because of the breadth of the search, Towne argues that the court should suppress all of the evidence seized.[10]

> The fruits of such a search must be suppressed in toto because "a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." . . . Thus, "blanket suppression" is required when it is clear from the circumstances that the search conducted by law enforcement agents "actually resemble[d] a general search" and that they did not comply with the warrant in good faith.

Id. at 12 (quoting United States v. Liu, 239 F.3d 138, 141 (2d Cir. 2000)).

The government concedes that "[m]uch of the evidence seized was not listed in the

---

[9]The statement – and Towne's procrastination in altering the Vulcan's VIN – also tend to explain why Towne had not been seen riding the Vulcan during the five months prior to the warrant's execution.

[10]Towne acknowledges that the warrant authorized the seizure of the club colors, the Vulcan, the motorcycle parts, and documents evidencing Towne's ownership of the same. Id. at 14-15.

9

warrant," but argues that the seizures are nonetheless justified under the plain view doctrine. Plain view rises to constitutional significance as a justification for warrantless seizures, not searches. "It is important to distinguish 'plain view,' as used . . . to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search . . . , the former generally does implicate the Amendment's limitations upon seizures of personal property." Brown, 460 U.S. at 738 n.4 (emphasis in original). "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. . . . A seizure of the article, however, would obviously invade the owner's possessory interest." Horton v. California, 496 U.S. 128, 133-134 (1990).

"Plain view" is best understood not as an exception to the warrant requirement but as an extension of the prior justification that brings an officer without a warrant into the presence of evidence or contraband. Brown, 460 U.S. at 738-739. The lawful view of an exposed item does not by itself justify a "plain view" seizure. For a seizure to be valid, there are two mutually dependent prerequisites: (1) a prior valid intrusion by officers into a constitutionally protected area; and (2) "immediate" recognition of the item's evidentiary significance (that is, probable cause for its seizure). Coolidge v. New Hampshire, 403 U.S. 443 (1971) (plurality opinion); Horton, 496 U.S. at 140.[11] Police executing a valid search

---

[11]"[T]he use of the phrase 'immediately apparent' [in Coolidge] was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Brown, 460 U.S. at 741. The doctrine requires only that an officer have probable cause *before* seizing an incriminating item. Minnesota v. Dickerson, 508 U.S. 366, 376 (1993).

or arrest warrant may seize evidence encountered in plain view. United States v. Robles, 45 F.3d 1, 6 (1st Cir. 1995); United States v. Aguirre, 839 F.2d 854, 858-859 (1st Cir. 1988).

Towne's objection, however, is not to the doctrine in the abstract, but to the intensity of the search that exposed the items that were seized.

> [T]he circumstances of the search strongly suggest bad faith. In particular, the fact that the agents indiscriminately searched the bedrooms, kitchen, dining room, front room, as well as the attic of the detached garage, suggests that they were not simply searching for motorcycle parts and Hells Angels colors but were looking for whatever they could find.

Def.'s Mot. to Suppress Mem. at 15-16.

The warrant issued by the Magistrate authorized the search of the property at 42 Belmont Street without restriction (other than by designating the items to be seized). If there is probable cause to believe that criminal activity is afoot in one room of a household, a warrant to search the entire dwelling is not overly broad. Commonwealth v. Waltson, 724 A.2d 289, 293 (Pa. 1998). A warrant authorizing officers to search an entire "premises" also permits the search of areas and structures "appurtenant to" (within the curtilage of) the main building. Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.10(a) (4th ed. 2004). See also Houser v. Geary, 465 F.2d 193, 195-196 (9th Cir. 1972) (hothouse, shed, and garage adjacent to the main dwelling); United States v. Ferreras, 192 F.3d 5,10-11 (1st Cir. 1999) (attic); United States v. Fagan, 577 F.3d 10, 14 (1st Cir. 2009) (storage closet eight feet from an apartment's front door); United States v. Canestri, 518 F.2d 269, 273-274 (2d Cir. 1975) (basement storeroom).

The intensity of a search "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." Maryland v. Garrison, 480 U.S. 79, 84 (1987), quoting United States v. Ross, 456 U.S. 798, 824 (1982). Thus, officers may search until all possibility that evidence identified in the warrant is concealed somewhere on the premises is exhausted. Commonwealth v. Wood, 389 Mass. 552, 558 (1983). Any unlocked or locked container on the premises that could reasonably conceal an item described in the warrant may be opened and searched. See United States v. Giwa, 831 F.2d 538, 543-544 (5th Cir. 1987). See also United States v. Gonzalez, 940 F.2d 1413, 1420 (11th Cir. 1991) (locked briefcase); United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987) (pockets of a jacket found on the premises); United States v. Wright, 704 F.2d 420, 422 (8th Cir. 1983) (officers searching for drugs opened a locked safe); United States v. Criswell, 696 F.2d 636, 640 (8th Cir. 1983) (refrigerator freezer compartment); United States v. Micheli, 487 F.2d 429, 432 (1st Cir. 1973) (briefcase).[12]

---

[12]The case cited by Towne as "fatal" to the government's plain view argument, United States v. Comprehensive Drug Testing, Inc., 579 F.3d 989 (9th Cir. 2009) (CDT), while earning both praise and criticism, is not apropos. In CDT, Chief Judge Kozinski, writing for an en banc majority, sought to flesh out rules for limiting searches of electronically stored information, where unlike the case of a seizure of file cabinets containing a reasonably limited universe of documents, "even inexpensive electronic storage media today can store the equivalent of millions of pages of information." Id. at 1004. The dilemma Judge Kozinski identified is created by the necessity of sorting through this enormous mass of undifferentiated electronic data at an off-site location, which when done at leisure by government agents means that every shred of stored information will automatically come into plain view, thereby rendering the limits of the doctrine a nullity. Id. at 998. Judge Kozinski did not disavow the plain view doctrine, instead he promulgated a rule (over vigorous dissent) requiring the government to waive reliance on plain view as an exception to the warrant requirement unless it was willing to have the sorting task performed by a neutral third party under a Magistrate Judge's oversight. Id. Here, of course, no electronically stored data is at issue and what little sorting of papers that needed be done was done by Higginbotham at the scene and with

However, once articles described in the warrant have been located, the authority to search expires. See LaFave, supra, 2 Search and Seizure § 4.10(d). See also United States v. Gagnon, 635 F.2d 766, 769 (10th Cir. 1980). If items are seized outside the scope of the warrant, "the normal remedy is to suppress the use of all items improperly taken." United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999). If, however, officers grossly exceed the scope of a warrant they may invite the blanket suppression of all items seized. See United States v. Foster, 100 F.3d 846, 850-851 (10th Cir. 1996) (officers executing a drug and firearms warrant seized "everything of value" in defendant's home); United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988) (federal agents executing a warrant for firearms permitted a local sheriff to seize 667 unlisted items that he believed were stolen).

Here, sequence matters. The issue is whether the searching officers had found everything contemplated by the warrant before the search was extended through the house and into the garage, or whether the "plain view" seizures fell within the natural progression of the authorized search. As the timeline set out earlier in this opinion makes clear, the motorcycle parts which were identified in the warrant were found only at the end

---

dispatch. The Seventh Circuit's commentary on CDT in United States v. Mann, 592 F.3d 779, 785 (7th Cir. 2010), summarizes the dissenting view succinctly: "Although the Ninth Circuit's rules provide some guidance in a murky area, we are inclined to find more common ground with the dissent's position that jettisoning the plain view doctrine entirely in digital evidence cases is an 'efficient but overbroad approach.' We too believe the more considered approach 'would be to allow the contours of the plain view doctrine to develop incrementally through the normal course of fact-based case adjudication.'" (quoting CDT, 579 F.3d at 1013).

of the search when the search team reached the detached garage.[13]  There is no evidence that police deliberately delayed the search of the garage in order to continue the search of the house or its contents or otherwise acted in bad faith.  Consequently, the items unnamed in the warrant were properly seized as they came into plain view.

Outrageous Government Misconduct

Towne's motion to dismiss the indictment is an equitable extension of the affirmative defense of entrapment.  Towne alleges that the underlying crime was orchestrated by an undercover FBI agent whose methods swept Towne into a "virtual reality show" – "written, produced, and directed by the United States Government."  Def.'s Mot. to Dismiss Mem. at 3-4.  As Towne sums up his argument:  "[T]he Government's conduct in orchestrating the drug transaction was outrageous . . . because it went over the edge of what otherwise might be considered a reasonable exercise of creativity in the Government's 'War on Drugs.'"  Id. at 5-6.[14]  What Towne has in mind is the fact that UC-1 used deception to ingratiate himself with Towne and other defendants, invented imaginary Mexican and

---

[13]Although not argued by the government, there is significant authority supporting the proposition that police who find some evidence of drug activity have probable cause to believe that additional evidence of drug activity will be found on a premises. See United States v. Washington, 852 F.2d 803, 804-805 (4th Cir. 1988); United States v. Rey, 923 F.2d 1217, 1220-1221 (6th Cir. 1991).

[14]An alternative theory suggested in defendant's brief is that by the staging of the penultimate drug sting (some seven months before the search of Towne's residence) in the parking lot of a shopping mall (the Westgate Mall), government agents recklessly exposed innocent third-party civilians to harm.  "[T]he atmosphere was tense.  The potential for violence leading to injury or death to the public and the participants was enormous."  Id. at 3.  Whether or not true, Towne does not have standing to press the potential emotional distress claims of third-party observers or, as he suggests at one point in his brief, the safety interests of the law enforcement officers involved.  See Rakas v. Illinois, 439 U.S. 128, 138-139 (1978).

14

Canadian organized crime "connections," and arranged a fictitious delivery of drugs supplied by the government in a transaction in which Towne's only role was to provide "protection."[15]

Entrapment is an issue of fact and is therefore an inappropriate subject for a motion to dismiss. However, related to entrapment is a defense at law – the claim that the conduct of the government in engendering a prosecution was so outrageous that as a matter of law it violated the fundamental principles of fairness embodied in the Due Process Clause of the Fifth and Fourteenth Amendments (notwithstanding any predisposition on the defendant's part to commit the crime).[16] See Hampton v. United States, 425 U.S. 484, 491-495 (1976) (Powell, J., concurring); United States v. Russell, 411 U.S. 423, 431-432 (1973) (dicta); United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990); Commonwealth v. Monteagudo, 427 Mass. 484, 485-486 (1998). The issue of whether government misconduct amounted to a due process violation is for the trial judge, not the jury. Hampton, 425 U.S. at 497; United States v. Johnson, 565 F.2d 179, 181-182 (1st Cir. 1977).

"[A] successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." United

---

[15] It bears noting that Magistrate Judge Sorokin, who presided at Towne's lengthy detention hearing, found that the protection detail had been organized by Towne and co-defendant Joseph Noe, the President of the Taunton chapter of the Outlaws, and that Towne on his own initiative had recruited others to act as "lookouts."

[16] Although the government devotes most of its brief to rehearsing Towne's role in the events that led to his arrest, Towne does not deny (although he does minimize) his role in providing "protection" for the main players in the supposed drug transaction.

States v. Jannotti, 673 F.2d 578, 607 (3d Cir. 1982) (en banc).  The conduct at issue must be "most egregious" and "so repugnant and excessive" as to "shock the [judicial] conscience."  United States v. Alexandro, 675 F.2d 34, 39, 40 (2d Cir. 1982).  As Justice Powell predicted in Hampton (a reverse sting drug case), the degree of outrageous behavior contemplated was so extreme that it would be a rare case in which a due process defense prevailed.  Only two federal appeals court decisions since Hampton (one of which was subsequently withdrawn) have upheld the dismissal of an indictment for outrageous government misconduct.  See United States v. Solorio, 37 F.3d 454 (9th Cir. 1994) (contingent informers' fees), withdrawn and superseded by, 53 F.3d 341 (9th Cir. 1995); United States v. Twigg, 588 F.2d 373, 380-381 (3d Cir. 1978) (government established, stocked, and ran an illegal drug laboratory).  See also United States v. Tucker, 28 F.3d 1420, 1427 (6th Cir. 1994) (the due process entrapment defense "simply does not exist"); United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) (the doctrine is "moribund").  Cf. United States v. Miller, 891 F.2d 1265, 1271 (7th Cir. 1989) (Easterbrook, J., concurring) ("Why waste litigants' and judges' time searching for and rejecting on the facts defenses that ought not exist as a matter of law?").

Because the due process test is an objective one, "[e]ven a willing defendant may claim a violation of due process."  United States v. Bradley, 820 F.2d 3, 7 (1st Cir. 1987).  "[T]he focus . . . is not on the propensities and predisposition of a specific defendant, but on 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.'"  United States v. Russell, 411 U.S. 423, 441 (1973) (Stewart, J., dissenting), quoting Sherman v.

United States, 356 U.S. 369, 382 (1958). For a representative sample of cases in which the defense has been examined and rejected, see United States v. Mazzella, 768 F.2d 235, 238-239 (8th Cir. 1985) (sale of precursor chemicals by drug agents to defendant was not "outrageous"); United States v. Ford, 918 F.2d 1343, 1349 (8th Cir. 1990) (same, agents provided a small sample of drugs to facilitate a "reverse sting"); United States v. Santana, 6 F.3d at 11-12 (same, 13.3 grams of 92 percent pure heroin later distributed by the recipient); United States v. Mosley, 965 F.2d 906, 911-912 (10th Cir. 1992) ("supply and buy" drug transactions); United States v. Smith, 802 F.2d 1119, 1125-1126 (9th Cir. 1986) (agents used defendant's brother as an informant); United States v. Simpson, 813 F.2d 1462, 1464-1468 (9th Cir. 1987) (informant developed and exploited a sexual relationship with defendant), further proceedings, 927 F.2d 1088 (9th Cir. 1991); United States v. Nolan-Cooper, 155 F.3d 221, 232-235 (3d Cir. 1998) (undercover agent wined, dined, and eventually had intercourse with a defendant).

When measured against the sometimes sordid facts in this array of cases in which the defense has failed, I cannot say as an objective matter that there is anything about this garden variety "sting" that shocks or even pricks the conscience of the court.[17] The

---

[17]Towne also suggests a theory of sentencing manipulation, that UC-1 "*solely* determined the weight and kind of controlled substances" (forty kilograms of cocaine and one thousand pounds of marihuana) that would be involved in the sting. "Sentencing factor manipulation" describes a species of "outrageous government conduct" consisting of a series of inducements offered to a willing defendant solely as a means of ratcheting up his sentence. See United States v. Jones, 18 F.3d 1145, 1152-1154 (4th Cir. 1994). Cf. United States v. Cotts, 14 F.3d 300, 306 n.2 (7th Cir. 1994) (distinguishing "sentencing manipulation" from "sentencing entrapment" – inducing a defendant disposed to commit a lesser crime into committing a greater one of the same general character). The sentencing manipulation and sentencing entrapment theories have had a hostile reception in the federal courts. See United States v. Washington, 44 F.3d 1271, 1279-1280 (5th

17

government (and particularly UC-1), it is true, fooled Towne and the others and betrayed their misplaced trust, but the law has long approved of the trap set "for the unwary criminal." Sherman, 356 U.S. at 372. See United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987); United States v. Fera, 616 F.2d 590, 596 (1st Cir. 1980).

## ORDER

For the foregoing reasons, the motion to suppress is DENIED. The motion to dismiss is also DENIED.

SO ORDERED

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

Cir. 1995) ("trendy" theories in passing vogue); United States v. Garcia, 79 F.3d 74, 76 (7th Cir. 1996) (rejecting sentencing manipulation as a matter of law); United States v. Williams, 954 F.2d 668, 672-673 (11th Cir. 1992) (same, sentencing entrapment); United States v. Walls, 70 F.3d 1323, 1329 (D.C. Cir. 1995) (same). See also United States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994) (courts should proceed with caution in staking out rules that might inhibit government undercover operations); United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995) ("[G]arden variety manipulation claims are largely a waste of time.").